Bruce L. Ishimatsu (SBN 86145)
ISHIMATSU LAW GROUP, P.C.
4712 Admiralty Way, No. 1012
Marina del Rey, California 90292
(310) 200-4060 Telephone
(310) 496-1540 Facsimile
bruce@ishimatsulaw.com

Attorneys for Plaintiff
Barbara H. Ohno

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| BARBARA H. OHNO, an individual<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF INGLEWOOD; a municipality; MAYOR JAMES T. BUTTS, an individual; DAVID ESPARZA, an individual; SHARON KOIKE, an individual; and DOES 1 through 30, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **Violation of First Amendment and Fourteenth Amendment of the United States Constitution against Individual Defendants;**<br><br>2. **Violation of First Amendment and Fourteenth Amendment of the United States Constitution against Defendant City of Inglewood under *Monell*;**<br><br>3. **Violation of California Labor Code section 1102.5 – Whistleblower Retaliation against all Defendants**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW PLAINTIFF BARBARA H. OHNO ("Plaintiff" or "Plaintiff Ohno"), AND FOR CAUSES OF ACTION AGAINST DEFENDANTS, ALLEGES AS FOLLOWS:

1
Complaint

**JURISDICTION**

1.     This action is for deprivation of civil rights under color of state law pursuant to Title 42 United States Code section 1983, for remedies for Defendants' deprivation of Plaintiff's civil rights.  Plaintiff seeks all relief to which she may be entitled, under both state and federal laws including, but not limited to, compensatory and punitive damages, attorneys' fees and costs, and prejudgment interest. Jurisdiction of the subject matter of this action is established in this court by 28 U.S.C. 1331 and 1343, and over supplemental claims for relief arising under state law pursuant to 28 U.S.C. 1367(a).

**VENUE**

2.     Venue lies in this Court pursuant to 28 U.S.C. section 1391(b)(1) and (2).

**CLAIMS FOR RELIEF**

3.     Plaintiff Ohno is an individual who, at all times herein, resided in the State of California and within this judicial district.

4.     Plaintiff Ohno is informed and believes and thereupon alleges that the individuals named as Defendants, and each of them, were and are residents of the State of California during the times referenced herein.

5.     Defendants Mayor James T. Butts, David Esparza, Sharon Koike, and Does 1 through 10, inclusive, were and are now residents of the State of California, and were and are employees and representatives of Defendant City of Inglewood (hereinafter referred to as the "City" or the "City of Inglewood").  At all relevant times herein, said individual Defendants were acting within the course and scope of their employment.  The wrongful acts alleged herein flow from the very exercise of their authority.  Each Defendant named herein is sued in his/her individual and official capacity.

6.     Defendant James T. Butts was elected as Mayor of the City of Inglewood on January 2011 and continues in that capacity (hereinafter referred to as "Defendant

Mayor Butts" or the "Mayor"). Defendant Mayor Butts rose up through the ranks of law enforcement and is an advocate of a command style of municipal governance. Subordinates are to carry out the boss' orders without question. Defendant Mayor Butts is the former Chief of Police for the City of Santa Monica, the former head of security and law enforcement for Public Safety for Los Angeles World Airports ("LAWA") and served as a police officer, commander of a SWAT team, an undercover officer, homicide detective and deputy police chief in the Inglewood Police Department.

7.    When Defendant Mayor Butts was elected Mayor of Inglewood in 2011, the City of Inglewood was operating on an $18 million deficit. He was elected in a close and hotly contested election over incumbent mayor, Danny Tabor. Defendant Mayor Butts ran his mayoral campaign by promising a new direction for the City and an overhaul of its finances due to its massive deficit. Defendant Mayor Butts has declared publicly that "We were really bankrupt from the auditing of the books basis because we owed our employees $14 million in sick and vacation leave."[1] "When I took office in 2011, we were down to our last $11 million...we would have been cash flow bankrupt by the end of June."[2] "Cities that don't do the things that are fiscally responsible and prudent, they risk going out of business."[3]

8.    Defendant Mayor Butts represents Defendant City of Inglewood and is a significant voice of authority in determining its policies and practices in all respects, including the Finance Department. He is also instrumental in determining how the City's policies and practices are implemented by all City departments, including the Finance Department.

9.    Plaintiff is informed and believes and based thereon alleges that

---

[1] 2015 State of the City Address, May 2, 2015.

[2] Id.

[3] Id.

Defendant City of Inglewood is a municipality that maintains its own Finance Department where Plaintiff was employed.

10.   Defendant David Esparza (hereinafter referred to as "Defendant Esparza") was and is the Chief Financial Officer and Assistant City Manager of the City.  Defendant Esparza oversees the City's Finance Department and has a close professional relationship with Defendant Mayor Butts.  Defendant Esparza was Plaintiff Ohno's direct superior to whom she was hired to report to in the Finance Department.

11.   Defendant Sharon Koike (hereinafter referred to as "Defendant Koike") was and is the Assistant Finance Director of the City and was, at all relevant times alleged herein, an *inactive* Certified Public Accountant who held herself out as a licensed CPA.  Defendant was Plaintiff Ohno's colleague in the Finance Department at the City and both of them reported to Defendant Esparza.

12.   Plaintiff Ohno is informed and believes and thereupon alleges that at all times mentioned herein, Defendants and DOES 1 through 10, inclusive, were employed by or were agents of the City of Inglewood.  Plaintiff is informed and believes and thereupon alleges that DOES 1 through 10, inclusive, are residents of the County of Los Angeles, State of California.

13.   At all times alleged herein, each and every Defendant was the agent of each and every other Defendant and had the legal duty to oversee and supervise the hiring, conduct, and employment of each and every other defendant named and unnamed in this Complaint.

14.   The true names or capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 30, inclusive, are unknown to Plaintiff who therefore sues these Defendants by such fictitious names.  Each Defendant is sued individually and in his/her official capacity as defined in this Complaint.  Plaintiff will seek leave to amend this Complaint to show the true names and capacities of these

Defendants when they have been ascertained.  Each of the fictitiously named Defendants is responsible in some manner for the conduct or liabilities alleged herein.

15.    Plaintiff Ohno is informed and believes and thereupon alleges that, at all times herein alleged, each of the Defendants, including the fictitiously named Defendants, was the agent and/or employee of each of the remaining Defendants, and in doing the things alleged herein, was acting within the scope and course of such agency.

## STATEMENT OF FACTS

16.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 15, inclusive, of the Complaint and incorporates the same therein by reference as though fully set forth.

17.    Plaintiff Ohno, a licensed and active Certified Public Accountant, was hired by Defendant City of Inglewood on August 25, 2014 as its Budget & Accounting Manager in the Finance Department at the City of Inglewood.  Plaintiff served in that capacity until June 4, 2015 when she was wrongfully terminated, without notice or justification.

18.    Plaintiff Ohno has 3 ½ years of audit experience from Deloitte & Touche, a public accounting firm, and over 30 years of accounting and finance experience including internal audits, financial planning (budgets) and analysis, taxes, compliance, general accounting, financial reporting, regulatory and SEC reporting.

19.    While employed by the City of Inglewood, Plaintiff Ohno's duties included overseeing City budgeting, accounting, accounts payable, financial reporting and analysis, including compliance with taxes, annual audits and regulatory reporting. Plaintiff Ohno's duty was to execute tasks in the above areas.  She was not hired to file complaints or to report irregularities in the policies and practices of the City, or its Finance Department.

20.    Plaintiff Ohno was recruited by Defendant Esparza to work for

Defendant City and left a well-paying and prestigious position to work for the City. Plaintiff Ohno relied on the City's representations that she would have access to all personnel, information and documents necessary to do her job and would be a trusted employee within the Finance Department. Had she known that she would be retaliated against by the Defendants in this case for reporting rampant financial and accounting irregularities at the City, she never would have left her prior employment.

21.    In her capacity as the Budget & Accounting Manager for the City, Plaintiff Ohno reported to Defendant Esparza, her immediate supervisor.

22.    As alleged herein, the City, at the direction of Defendants Mayor Butts, Esparza and Koike and others, regularly and knowingly fostered, ordered and engaged in faulty financial and accounting practices, fraudulent regulatory reporting, and reclassification of costs to depict a favorable, but false, financial picture of the City's General Fund and overall fiscal responsibility.

23.    Throughout her employment with the City, Plaintiff Ohno brought to the attention of outside agencies, her superiors and colleagues certain financial and accounting improprieties practiced by the City that needed to be remedied and disclosed to federal, state and local agencies but, at every turn, the Defendants admonished her, ignored and thwarted her remedial and disclosure recommendations, ridiculed her, and threatened to terminate her employment unless she fell into line and perpetuated the improper, illegal and fraudulent practices and conduct of the City and its Finance Department. Her unwillingness to play along and remain silent ultimately led to her termination as retaliation for trying to do the right thing.

### The Lure of a National Football League Team in Inglewood

24.    Plaintiff is informed and believes and thereupon alleges that her immediate superiors and colleagues insisted on perpetuating the improper, illegal and fraudulent accounting and financial practices at the behest of Defendant Mayor Butts whose plan was to create a façade of financial responsibility and well-being for the

City in order to attract a National Football League ("NFL") team, something that was under review by the NFL team owners and NFL Commissioner.  Plaintiff is informed and believes and thereupon alleges that the policies and practices of  Defendant Mayor Butts were implemented without regard to law, proper accounting standards and federal, state and other agency guidelines and policies because Defendant Mayor Butts and the City were overconfident that as soon as an NFL team was awarded to the City, millions upon millions of dollars would befall the City which would enable the City to conceal the financial and accounting improprieties before the NFL, the public, or the federal government, would notice.  As the Mayor has noted in a public presentation: "No one was going to invest in Inglewood because of the crime, the political situation, and the fiscal mismanagement."[4]  Defendant Mayor Butts put the financial boom of an NFL team and modern stadium into sharp perspective when he noted that the City would reap $15 million in sales tax revenue in 2016-17 from the construction of the stadium and $25 million each year thereafter.  That figure represents a significant portion of the City's entire General Fund budget which is $79 million to $82 million per year and would be used, among other purposes, to increase the size of the Inglewood police department.[5]

     25.    The prospect of bringing an NFL team to the City of Inglewood was a larger plum than just bringing a professional football team to the Los Angeles area. Much more was at stake for the City of Inglewood.  If the NFL approved a team to relocate to Inglewood, it meant that a new, modern stadium would be built that would attract international soccer tournaments, political conventions, championship boxing matches, the Olympics, Super Bowl games, NCAA Final Four basketball tournaments, professional football combines, NFL football sports drafts, NFL Pro Bowl games, and more.  Plaintiff Ohno's employment with the City in 2014-15

---

[4] Public remarks at the USC Price School of Public Policy, April 19, 2016.

[5] 2015 State of the City Address, May 2, 2015.

Complaint

coincided directly with the NFL's critical beauty contest to relocate the St. Louis Rams, the San Diego Chargers and/or the Oakland Raiders football teams, all of whom were negotiating relocations from their current cities with an eye on the City of Inglewood or the competing City of Carson.

26.    The last thing Defendant Mayor Butts and the City wanted was for its financial housekeeping and viability to be questioned or exposed by someone like Plaintiff Ohno, especially when the neighboring City of Carson was courting the NFL to relocate an NFL team to Carson. The stakes of landing an NFL team and all of the economic fallout that would naturally follow the team were far too high to allow financial and accounting improprieties to get in the way of the City and the Mayor. Defendant Mayor Butts was elected in 2011 on a platform of reforming the finances of the City. The lure of bringing an NFL team to Inglewood was the panacea for the City's financial woes and was the centerpiece of Defendant Mayor Butts' policy platform.

27.    When he came into office as Inglewood's mayor, Defendant Mayor Butts believed that "If we don't fix this city, in a responsible, fiscally prudent manner, no one, *no one* thinks about spending billions of dollars of investment money and capital here."[6]

28.    In preparation for an NFL team, on February 24, 2015, the Inglewood City Council approved the development of the multi-purpose, $1.8 billion, 100,000 seat stadium on the old Hollywood Park site with plans for up to 890,000 square feet of retail, 780,000 square feet of office space, 2,500 new residential units, a 300-room hotel and 25 acres of public parks, playgrounds, open space and pedestrian and bicycle access. While the world class stadium will be built with private funds, the developer is seeking significant tax breaks from the City of Inglewood. The stadium is planned to open in 2019.

---

[6] 2015 State of the City Address, May 2, 2015.

8

Complaint

29.     The significance of getting an NFL team was far too important to allow the financial and accounting improprieties observed by Plaintiff Ohno to see the light of day and interfere with Defendant Mayor Butts' grand scheme to revitalize the City of Inglewood on the skirts of the NFL and the St. Louis Rams football team.

30.     Defendant Mayor Butts has declared that landing the Rams football team defines his political legacy.[7] According to him, the economic stakes are massive:  the 6-7 year construction of the mixed-use community surrounding the new football stadium will create 22,000 jobs, 30 percent of which will be locally sourced. Thereafter, operating the business/residential/entertainment center surrounding the new football stadium will create 12,000 full and part time jobs with 30 percent coming from local hires.[8]  It is no surprise that the Mayor and the City had no tolerance for Plaintiff Ohno whom they labeled a "trouble maker" when she blew the whistle on the City's financial and accounting improprieties.  They muzzled and ultimately terminated her for exercising her civil right of free speech in an effort to protect public funds and governmental transparency.

31.     Defendant Mayor Butts has made many public statements which confirm that the City was in dire financial straits when he took office in 2011 and he had his eyes on an NFL football team and world-class stadium to revitalize the City. According to Defendant Mayor Butts, "the vision was we needed to get our infrastructure together, we needed to get our fiscal house together to exploit the blessings of our geography."[9]

32.     Plaintiff Ohno became a major sore point for the City and the Mayor because her observations as a Certified Public Accountant could not be discounted and she refused to turn a blind eye to the illegal and fraudulent manipulation of public

---

[7] KPCC 89.3 "Take Two" radio interview of Mayor Butts on January 13, 2016.

[8] Id.

[9] Presentation on April 19, 2016 at the USC Price School of Public Policy.

9

Complaint

1    funds.  Contrary to Defendant Mayor Butts, the City's "fiscal house" was anything but

2    "together."  It was in massive disarray and he knew it -- his reporting of the financial

3    health of the City was false.  This meant that the City and the Mayor had no choice

4    but to remove her before the NFL team owners caught wind of her protestations

5    amidst their deliberations as to whether the City of Inglewood was worthy of hosting

6    the St. Louis Ram or any other professional football team over other cities vying for

7    the same privilege and economic boost.

8                **The City Plays Fast and Loose with Public Money**

9            33.    Like most municipalities, the City utilized "fund accounting" which

10    segregates all money received by the city into separate funds earmarked for specific,

11    restricted purposes in accordance with laws and regulations or special restrictions and

12    limitations.  The money going into and out of a particular "fund" is supposed to be

13    reconciled so that at any given moment, the City can identify how much money is in

14    each fund.  Also, the purposes for which the money in each fund is spent is spelled out

15    in grant restrictions, laws and regulations.  The City is essentially the trustee of public

16    funds and has a fiduciary duty to the public to spend money in accordance with fund

17    restrictions.

18            34.    The City used one pooled bank account into which all revenue and grant

19    money was deposited *without segregation*, thereby making it nearly impossible to

20    trace or track the use of City monies.  All of the City's revenue (e.g., taxpayer

21    property taxes, sales taxes, building permit fees, etc.), with the exception of parking

22    revenue from other cities and reimbursements from the California Department of

23    Revenue, were deposited into this one pooled bank account. There were several

24    "funds" that shared this pooled bank account.  One such fund was the City's "General

25    Fund" which was used to pay for the City's non-grant expenses to operate the City.

26            35.    Other restricted or "special purpose" funds for water, sewer, and

27    sanitation are considered separate enterprise funds that are profit oriented.  Specific

28

federal and state grant monies should be accounted for in separate designated or special purpose funds with the restricted uses specified by the granting agency. However, because the City of Inglewood was operating at a multi-million dollar deficit, it became necessary for it to pay for its day-to-day operations using money from restricted or special purpose funds and not the General Fund, without regard to legal and regulatory prohibitions. For example, because the City was unable to operate within its means, it regularly used not only grant monies but also water fund monies to pay operating expenses that should have been paid out of the General Fund.

36.    Another fund of money was the "Asset Forfeiture Fund" which was regulated by federal law and the federal Department of Justice (hereinafter referred to as the "DOJ"). The Asset Forfeiture Fund consisted of assets that the City's Police Department had seized from federal crime enforcement. Pursuant to the program's guidelines, the federal government shares the value/money of the seized assets with cooperating cities such as the City of Inglewood. According to the rules of the program, the City of Inglewood was permitted to use that money only for *specific* police-related expenses and was obligated to abide by those expenditure restrictions. However, on a regular basis, the City, at the direction of Defendant Mayor Butts, violated the rules of the program by tapping into the Asset Forfeiture Fund to pay for unauthorized expenses, again because there was insufficient money in the General Fund to cover such expenses.

37.    The City did not properly reconcile each fund's cash and reserve position which, if done, would have highlighted illegal and improper uses of restricted grant money. By not reconciling the money going into and out of a particular fund, it was common practice for the City to spend restricted Fund A money for unrestricted General Fund purposes even if Fund A money was prohibited by law from being spent on unrestricted General Fund purposes.

38.    Plaintiff is informed and believes and thereupon alleges that the City, at

the direction of Defendant Mayor Butts, engaged in inappropriate and illegal financial and accounting practices in order to make the City's financial picture look better than it really was in order to increase its chances of landing an NFL football team which would bring millions of dollars of revenue into the City. To a large extent, the financial and accounting irregularities alleged herein were the result of the General Fund deficit that the City desperately wanted to conceal from the federal and state governments, the public and the NFL. The only remedy was to entice the NFL to relocate a professional football team to Inglewood and construct a modern sports stadium and a mixed-use development that would throw off millions of dollars to the City for years to come from new revenue sources and sales tax revenues which would decrease the unemployment in the City and cast Defendant Mayor Butts as a public hero.

39.    In January 2016, the NFL announced that billionaire Stan Kroenke's St. Louis Rams football team was approved by the NFL to relocate to Inglewood, California. Apparently, the NFL was convinced that the City of Inglewood would be a good host city for the St. Louis Rams which the NFL team owners approved in a 30-2 vote over the City of Carson which lost its bid for a professional football team.

40.    Plaintiff was informed by Defendant Esparza that the public accounting firm of Mayer Hoffman & McCann ("MHM") was awarded the contract to audit the City because they were the only firm that would issue a clean opinion, would not fully audit the City's financial operations, and would render whatever opinion the City demanded.

### Plaintiff Discovers Misuse of COPS Hiring Grant Money

41.    The COPS Hiring Program ("CHP") grants provided for partial funding of approved entry level salaries and fringe benefits for full-time law enforcement officers for a 36 month period. The money was intended for the City to hire new law enforcement officers and fill positions at the Inglewood Police Department (including

1  existing officer vacancies) that were no longer funded or to re-hire officers who were
2  either laid off or scheduled to be laid off.

3      42.    However, contrary to the restrictions on the CHP grant funds, the City
4  treated it as "General Fund" money and spent it for non-grant purposes such as
5  veteran officer promotions and overtime.  In addition, Mr. Micah Herd, the police
6  grants coordinator for the City, routinely transferred and charged additional
7  unallowable costs to the CHP grant fund as well as to the Asset Forfeiture Fund.

8      43.    During the fall of 2014, the DOJ followed up on the City's continual non-
9  compliance with respect to the CHP grant requirements and requested the City to
10 reimburse DOJ for unallowable personnel and expenses charged to this grant.

11     44.    When the CHP grant ended on May 31, 2015, the City was proposing to
12 tap into the U.S. Department of Housing and Urban Development ("HUD")
13 Community Development Block Grant ("CDBG") monies which was a violation of
14 the CDBG fund restrictions.

15     45.    Plaintiff Ohno, along with Yolanda Douglas, a Police Department fiscal
16 analyst, and Debra Crenshaw, an accountant for police grants, reported the misuse of
17 the CHP grant monies and the Asset Forfeiture Fund monies[10] to Defendants Esparza
18 and Koike who turned a blind eye and never took steps to rein in or account for the
19 misuse of the grant money.  Consequently, none of the remedies and disclosures
20 recommended by Plaintiff Ohno were implemented by the City.

21     46.    Defendants Esparza and Koike told Plaintiff Ohno that the Asset
22 Forfeiture Fund money could be used for any purpose that Defendant Mayor Butts
23 wanted and that Plaintiff Ohno needed to "fall into line" with the Mayor's directives
24 as to how the grant money would be used regardless of federal DOJ guidelines.
25 Defendants Esparza and Koike told Plaintiff Ohno that the purpose of the Finance

26

27 [10] "Asset forfeiture funds" are monies seized by the Inglewood Police Department when it assists the federal
   government in federal crime enforcement.  The Department of Justice ("DOJ") allows the City to share in
28 those monies but only for specified purposes.

1   department was to ensure that the Mayor's directives were carried out without

2   question. Defendant Esparza told Plaintiff Ohno on more than one occasion that when

3   the money from the football stadium came in, the City would have so much money

4   that football money would be used to reimburse these grant monies and that no one

5   would know or care about the prior misuse of the money in the City's funds.

6       47.    On information and belief it is alleged that Defendants Esparza had a

7   direct line of communication to Defendant Mayor Butts and did whatever the Mayor

8   wanted done. Defendant Esparza would never insist on bending or breaking rules

9   without the direct or tacit approval of the Mayor because it would jeopardize

10  Defendant Esparza's chances of someday becoming the City Manager who runs all

11  operations of the City, not just the Finance and other Departments. Defendant

12  Esparza confided in Plaintiff Ohno that when he was ultimately promoted to City

13  Manager, he would promote Defendant Koike to Chief Financial Officer. Everything

14  that Defendants Esparza and Koike did to thwart, admonish, threaten, harass and

15  coerce Plaintiff Ohno was the direct result of tacit or express directives and/or

16  informed approval from Defendant Mayor Butts and his personal confidant, Royce

17  Jones.

18      48.    Plaintiff tried to revamp the City's use of the CHP and Asset Forfeiture

19  Fund money to comply with the restrictions imposed by the grants but was told by her

20  supervisor, Defendant Esparza, and Defendant Koike to stand down and allow the

21  money to be used however the Finance Department deemed appropriate, regardless of

22  the grant requirements and the admonitions of the DOJ.

23      49.    When Plaintiff Ohno refused to ignore the misuse of the Asset Forfeiture

24  Grant money, Defendants Esparza and Koike directed other employees within the

25  Finance Department to treat Plaintiff with scorn, bullying, harassment, isolation and

26  non-cooperation so that Plaintiff Ohno could not obtain access to personnel,

27  information and documents that were necessary for her to fulfill her job

28

Complaint

responsibilities.  This treatment began in or about October 2014 and continued to persist throughout Plaintiff's employment with the City.

**The City Violates HUD and California Department of Finance's Rules and Regulations**

50.    In or about October 2014, Plaintiff Ohno discovered financial mismanagement, inaccurate and fraudulent reporting and non-compliance with federal and state funds such as DOJ grants, HUD Section 8 Housing Choice Voucher grant funds, the California Department of Finance Affordable Housing and Redevelopment funds, and fraudulent reporting in the City's 2013 audited financial statements due to the intentional misrepresentation of fact by Defendant Koike to the City's outside auditors, MHM.  Defendant Esparza was fully knowledgeable of and condoned Defendant Koike's misrepresentations.  In turn, MHM failed to perform adequate audit testing procedures and due diligence that are standard in the accountancy practice.

51.    HUD's CDBG and the California Department of Finance's Affordable Housing Grant money made available to the City was supposed to be loaned to first-time home buyers as interest free, second mortgages.  HUD rules and regulations required loan recipients to be income certified and to fall within specific income qualifications.  The homes purchased with these funds were to be occupied by the recipients, not used for investment purposes, and subject to annual income and residency certification.  The recipients of these monies were supposed to repay the loans if the properties were sold or refinanced within a specified period of time.

52.    In violation of HUD and Department of Finance rules and regulations, the City misused the grant money as follows:

(a)    For 10 years prior to 2015, the City used Department of Finance Housing grant money to purchase a mixed residential/retail income property for investment purposes which were never used for affordable housing

15
Complaint

purposes. When Plaintiff Ohno discovered this impropriety, she informed Defendants Esparza and Koike that the property must be sold and the funds remitted to the State of California because the money was not being use for the intended purposes. However, Defendants Esparza and Koike refused to take corrective steps and, to make matters worse, intentionally concealed this problem from the California Department of Finance;

(b) Recipients of the HUD Section 8 Housing Choice Voucher Grant Funds were supposed to be pre-qualified and selected from a waiting list, however, the City, at the direction of Defendant Mayor Butts, hand-picked certain homeless citizens and tenants who were favored by the Mayor and the Housing Manager, Maria (Angie) Pacheco. Plaintiff Ohno discovered and the outside auditors found that the City often failed to distinguish whether the money used for affordable housing came from the Redevelopment Housing Fund or the CDBG Housing Fund. Nevertheless, Defendants Esparza and Koike refused to allow Plaintiff Ohno to clarify the source of funds to the appropriate governmental agencies;

(c) The City hired an outside contractor to monitor the use of the CDGB and redevelopment money but the contractor failed to properly review the qualifications of the recipients of the grant money which resulted in excessive loan defaults. Plaintiff Ohno discovered and reported this problem to Defendants Esparza and Koike but they refused to take remedial action to address the problem and discouraged Plaintiff Ohno from looking any further into the situation;

(d) The City extended loans to individuals who did not qualify for the CDGB home ownership loan program;

16
Complaint

(e) The City failed to certify income qualifications of CDGB loan recipients, failed to annually re-certify them to ensure compliance with HUD rules and regulations and failed to request repayment of the loan for violations of the home ownership program;

(f) Ms. Tunisia Johnson, the City Manager's (Artie Fields) administrative assistant, received a home ownership second mortgage loan even though her income level disqualified her from receiving the loan;

(g) The City failed to submit the annual cost allocation plans to HUD – as of 2014, the City had not submitted a plan to HUD since 2012. The cost allocation plan was critical for HUD to determine the overall overhead allocation costs and the methodology as applied to the grants it awards to the City. Defendant Esparza instructed Plaintiff Ohno to lie to HUD by telling it that the City had already filed its cost allocation plans which was untrue. Plaintiff refused;

(h) The City used the General Fund to subsidize the Section 8 Housing Choice Voucher program to pay salaries for City employees who should have been laid off during the 2013 work force reduction. The Housing Choice Voucher of the Section 8 program has two reserves: a "program" reserve (program operations) and an "administrative" reserve (to pay for personnel to operate the program). HUD requires the City to maintain an adequate administrative reserve to pay for program expenses due to delays and shortfalls by the federal government. The "administrative" reserve fees are earmarked to pay for personnel salaries for City employees needed to operate the Section 8 Housing Voucher program. When more vouchers are issued than authorized, or more dollars are spent than reimbursed, the program dips into the program reserves, something that is allowed so that the intended low-income recipients

17
Complaint

receive housing subsidies.  The program is designed so that there should be minimal or no program reserves.  Excess program or inefficient program operations can be paid for from administrative reserves *but* program reserves (for housing recipients) cannot be used to pay administrative expenses such as City employee salaries.  The City assigned excess and unnecessary personnel to the Section 8 housing program which drained the administrative reserves;

(i)     Maria Pacheco, the Housing Manager, referred to the Section 8 Housing Choice Voucher administrative reserves as the "full employment" program because it was used to employ City employees who were scheduled to be laid off as part of the City's work force reduction;

(j)     As a result of tapping into the administrative reserves to employ people who were scheduled to be laid off and did not have any work experience with Section 8 programs, the City then tapped into the General Fund to "subsidize" the administrative reserves by over $5 million in 2011. The amount of this subsidy was subsequently reduced to $1.2 million over a three year period, from 2012 to 2015.  General Fund money should never be used to subsidize the Section 8 administrative reserves except in extraordinary circumstances such as a government shutdown or sequestration, e.g., budget impasse when the federal budget is not approved; and

(k)     HUD's Section 8 Voucher Manager System ("VMS") required an organization receiving Section 8 Housing Choice Voucher grant money to submit reports each month disclosing the number of vouchers issued, the money received, money used and the reserve balances. However, the VMS did not accurately reflect Section 8 Choice Voucher program expenses from previous years because uncashed checks were

1          reissued and the program was charged again without crediting back the

2          uncashed checks to the fund which was an improper accounting practice.

3      53.     In an attempt to "rectify" the accounting records for the DOJ, California

4 Department of Transportation (Caltrans), Los Angeles County Metropolitan Transit

5 District (LACMTA), Federal Aviation Administration ("FAA"), Los Angeles World

6 Airports ("LAWA"), Hollywood Park, and HUD's CDBG programs, Defendant

7 Koike hired Matthew Lenton, a former MHM partner, as an independent contractor, to

8 prepare schedules by creating fictitious receivables which were not supported by

9 actual transactions. Defendant Koike authorized payments for services billed but not

10 performed by MHM. Ken Al-Iman, an MHM partner, acknowledged that he billed the

11 City and was paid for services not performed for the audits of the non-profit

12 organizations. Mr. Al-Iman told Plaintiff Ohno that Defendant Esparza told him that

13 he could keep these payments because Defendant Koike requested additional services

14 not covered by the audit agreement (and not approved by Defendant Mayor or the City

15 Council or by a formal agreement), which were performed and not billed. Plaintiff

16 Ohno confirmed this arrangement with Defendant Esparza who told Plaintiff Ohno

17 that MHM could keep the money because they were the only accounting firm willing

18 to provide the City with a clean audit opinion.

19      54.     Plaintiff Ohno reported the above improprieties to Defendants Esparza

20 and Koike however, they refused to take remedial action and, instead, told Plaintiff to

21 look the other way and "get with the program."

22      55.     Plaintiff Ohno reported her complaints to people who were outside of the

23 Finance Department where she worked. For example, she reported to Jeff Ball,

24 MHM's audit manager, regarding questionable payments to MHM, duplicate billing

25 and payments to MHM of the South Coast Air Quality Management District audit

26 performed by Simpson & Simpson (another public accounting firm), schedules

27 prepared by Matt Lenton which Defendant Koike provided MHM listing fictitious

28

receivables, properties listed twice on the books of the City and also on the City's redevelopment's books, vacant land that was depreciated as buildings even though the buildings had been demolished several years ago, Defendant Esparza's request not to disclose backdating of the Department of Finance repayment of unauthorized and questionable use of redevelopment money, the City's use of CDBG money to repay the Department of Finance when there was insufficient funds in the Redevelopment accounts, the City's request not to disclose to the auditors and the Department of Finance that properties listed on the long range plan with the Department of Finance had ground water contamination and the degree of contamination, and that properties listed on the long range plan with the Department of Finance had titles that were not properly transferred and still recorded as belonging to the City.

56.   In addition, Plaintiff Ohno reported complaints to (a) Wanda Brown, the City Treasurer, regarding financial improprieties; (b) Louis Atwell, Director of Public Works regarding the misuse of the Water Fund; (c) Linda Tatum, the City Planning Manager and her assistant, Evangeline Lane regarding the Hollywood Park accounting problems; (d) Bettye Griffith, the Residential Sound Insulation Manager regarding Residential Sound Improvement financial issues; (e) Thomas Uwall, Senior Transportation manager regarding the misreporting of programs funded by Propositions A and C; (f) Robert Braden, consultant to the Department of Public Works, regarding misreporting of Los Angeles County Metropolitan Transit Authority grant funds; (g) Yakema Decatur, Administrative Analyst, and Yolanda Douglas, Senior Budget Analyst, regarding (1) Defendant Esparza's duplicate commitment of $500,000 of AQMD grant funds for Inglewood police vehicles and the City's five year forecast, (2) Defendant Koike's recording of AT&T settlement money (approximately $145,000) without any budget amendment which resulted in deficit spending and (3) Defendant Esparza's duplicate commitment to repair the City's swimming pool and library renovation (approximately $200,000 each)which resulted in deficit spending;

(h) Artie Fields, the City Manager and Michael Falkow, the Assistant City Manager, regarding City's fiscal mismanagement and fraudulent reporting; (i) Teresa Sanford, Housing Supervisor, and Pamela Thigpen, the former Housing Manager, regarding the City's mismanagement of the Section 8 Housing Choice Voucher ("HCV") Program and the CDBG Program; and (j) Serena Martinez, Defendant Esparza's assistant in the Finance Department of overall harassment, mismanagement of funds and fraudulent reporting.

57.    Plaintiff Ohno also complained to Melissa Hebert, a part-time revenue clerk at the City who is also an independent reporter for the Los Angeles Times and maintains a blog about City politics and business.  Following Plaintiff's complaints to the City and to Ms. Hebert, Ms. Hebert informed Plaintiff Ohno that when she was on the "9th Floor" at City Hall where the Mayor, City Manager and Assistant City Manager and some City Council Members have their offices, Ms. Hebert was admonished by government officials not to publish anything regarding the City's operations or Ms. Hebert, would lose her job.  Prior to June 2015, Ms. Hebert also told Plaintiff Ohno that she was asked by government officials about Plaintiff Ohno being a "trouble maker."

58.    When Defendant Esparza heard about Plaintiff Ohno's complaints lodged outside of the Finance Department, he became incensed and reprimanded her by telling her to never again report such things outside of the Finance Department.

59.    Plaintiff Ohno continued to complain to Defendants Esparza and Koike about these financial improprieties which resulted in Plaintiff being isolated within the Finance Department, subjected to bullying, harassment, intimidation, coercion, and being denied access to information, personnel and documents necessary to do her job properly.  The retaliatory and hostile work environment created by Defendants Esparza and Koike had a chilling effect on Plaintiff Ohno's efforts to disclose and rectify the financial and accounting improprieties at the City.  The work environment

1 became extremely tense and uncomfortable for Plaintiff Ohno but she clung to the
2 hope that Defendants would come around and realize they needed to handle the City's
3 finances by the book which included disclosures to state and federal agencies. Plaintiff
4 tolerated the situation because she had left a good job to work for the City and needed
5 the income she was receiving as an employee of the City.

6 **Other Financial and Accounting Improprieties**

7     60.    Plaintiff discovered and complained to her superiors and colleagues at the
8 City about several other financial and accounting improprieties and the failure to
9 properly manage and account for state and federal grant money, including the
10 following:

11     (a)    The City operates a Residential Sound Insulation ("RSI") program
12 funded by LAWA and the FAA. This program is intended to provide
13 sound insulation (primarily windows) for homes in the LAX flight path.
14 In 2012, the City used over $4.8 million from the City's General Fund
15 without an executed contract with the FAA and LAWA for insulating
16 residents' homes due to airport noise. The City is attempting to negotiate
17 repayment from LAWA to replenish the General Fund. The City
18 recorded the $4.8 million expenditure but did not report that the money
19 came from the City's General Fund. The RSI's negative reserve balance
20 was hidden in the City's books by a fictitious receivable that was never
21 billed or agreed to by either the FAA or LAWA. This borrowing from
22 the General Fund and the subsequent overspending and negotiation with
23 LAWA was never disclosed or reported in the City's audited 2013
24 financial statements when it clearly should have been. Defendants
25 Esparza and Koike had been well aware of this deficit since 2012 but
26 when Plaintiff Ohno raised it with them in 2015 and recommended that
27 the City's financials be restated to disclose the borrowing from the

28

General Fund, they refused to take corrective action and, in fact, took affirmative steps to intentionally conceal the deficit. The intentional concealment of the "loan" from the General Fund monies resulted in the General Fund being overstated by approximately $5 million which was fraudulent;

(b)    Defendants Esparza and Koike authorized monetary payments and housing to silence one of Defendant Mayor Butts' most vocal critics, Ms. Ethel Austin, a resident of the City. In order to placate Ms. Austin and buy her silence, the City placed Ms. Austin in a house in Inglewood owned by the City. Ms. Austin moved into the house in 2012 with a Section 8 Housing Choice Voucher funded by HUD and the City paid for her electricity. When problems with the house arose, rather than relocating Ms. Austin to another affordable housing location, the City paid for Ms. Austin's extended vacation in Las Vegas in May 2015. Substantially all of the City's expenditures for Ms. Austin were irregular and an improper use of public funds. On information and belief, it is alleged that the special treatment given Ms. Austin was at the direction of Defendant Mayor Butts because he was frustrated and bothered by her vocal and public criticism of him;

(c)    Ms. Angie Pacheco, a City employee and Defendant Esparza provided Section 8 Housing Choice Vouchers issued by HUD to Cheryl Caldwell. These vouchers were used to pay Ms. Caldwell's first mortgage. In addition, the City awarded Ms. Caldwell an interest free second mortgage that allowed her to purchase a home. Ms. Caldwell did not meet the income qualifications for the program yet was allowed to participate in it;

(d)    In late 2014/early 2015, Ms. Caldwell sold her home resulting in a

Section 8 participant getting a windfall in excess of $30,000 (the equity in her home from the Section 8 Housing Choice Vouchers) of federal funds that was never refunded or repaid as it should have been under the Inglewood Housing Authority's program requirements;

(e)   During the period of Plaintiff's employment with the City, she discovered that there was a 25% default rate on these housing second mortgages resulting in foreclosures.  Rather than acknowledge these defaults as losses as standard accounting practices required, the City used Housing Redevelopment money in April-June 2015 to purchase these troubled properties before they were sold in foreclosure sales in order to conceal the defaults.  When Plaintiff Ohno reported this problem to Defendants Esparza and Koike they told that her to play along, be quiet and support Defendant Mayor Butts and his agenda, regardless of Federal, State or other governmental regulations;

(f)   The City used state redevelopment funds to purchase two parking structures in the City for over $6.7 million.  The City took title to these properties rather than make the State Redevelopment Agency the legal owner. During a meeting, Defendants Esparza and Koike were asked by Ms. Margarita Cruz, the City's Redevelopment Manager, to discuss the status of the properties held and financed by the Redevelopment money.  Defendant Koike reported to the California Department of Finance that these properties were deeded to the Redevelopment Agency which she knew to be untrue.  Mr. Royce Jones, a close personal friend and advisor to Defendant Mayor Butts argued that since the redevelopment agencies were going to be abolished in the future, there was no need to properly record the title to the

24
Complaint

properties because they would eventually revert back to the City. Defendants Esparza and Koike concurred with Mr. Jones' position and then agreed to conceal the problem from the California Department of Finance over Plaintiff's protestations;

(g)   The City used redevelopment money and failed to disclose contamination with one of the properties listed in the City's long range property management plan filed with the California Department of Finance, representing the State Redevelopment Agency. One such property, located in the Glasgow & Olive site, was initially scheduled to be sold to a car dealership that had occupied the adjoining lot. In May 2015, Margarita Cruz, the redevelopment manager, disclosed that this lot had ground contamination that had breached the water table. Mr. Jones intervened and argued that the contamination should not be disclosed to the California Department of Finance or to the buyer. He further argued that this should not be disclosed in the audited financial statements and that no further financial analysis should be performed to accrue for any potential remediation costs related to the contamination. Defendants Esparza and Koike concurred and therefore, no remediation costs were recorded and the degree of contamination was not disclosed to the California Department of Finance or the potential buyer. At the behest of Defendants Esparza and Koike and with the concurrence of MHM's audit partner, Ken Al-Iman, the ground contamination was omitted from the City's audited financial statements;

(h)   In November 2014, the City signed a settlement agreement with the California Department of Finance (the "Department") requiring the City to repay the Department approximately $25 million for unauthorized loans and transactions spent by the City with federal housing

Complaint

redevelopment monies.  The settlement agreement required the City to provide the Department with the City's redevelopment books to show that the $25 million was on the City's redevelopment books, available for the repayment, located in one bank account and that the settlement was properly recorded.  However, redevelopment monies were scattered in other accounts in the City's books.  Defendants Koike and Esparza had made false statements to the Department of Finance to the effect that the monies had been set aside, were properly accounted for, and available to repay the Department as of September 20, 2012.  Also, because the City was $1.7 million short of the $25 million, it reached into CDGB funds to pay the shortage which was improper.  In March 2015, Defendants Esparza and Koike instructed Plaintiff to instruct her accounting staff to "back-date" certain transactions to make it appear that the prior statements made by Defendants Esparza and Koike were true.  The "back-dating" involved three wire transfers sent on December 18, 2014 (i) for $13,302,590 to the Los Angeles County Auditor, (ii) for $11,277,664 to the Los Angeles County Auditor, and (iii) $645,410 to the City of Inglewood Successor Agency for repayment of unauthorized use of money.  Defendants Esparza and Koike instructed Plaintiff to back-date those 2014 transactions to October 1, 2013.  Plaintiff continually sought documents to support these transactions but was rebuffed and continually harassed for inquiring into the situation.  Ultimately, Plaintiff was instructed by Defendants Esparza and Koike to stop asking for supporting documentation and was instructed by Defendant Koike to "back date" these transactions, which she resisted until she was threatened with the loss of her job for failure to comply;

(i)    In April 2015, Defendant Esparza instructed Plaintiff Ohno to conceal the

back-dating of transactions from the City's external auditors, MHM. In May 2015, Defendant Esparza instructed Plaintiff Ohno to not disclose to the City's external auditors that $1.7 million of the $25 million repayment came from the CDBG fund when 100% of the money should have come from the Redevelopment Fund or the General Fund. Plaintiff Ohno told Defendant Esparza that she would not conceal the problem because as a Certified Public Accountant, she had a duty to report these incidents to the external auditors, which is precisely what Plaintiff did. When Defendant Esparza learned that Plaintiff Ohno had disclosed the issue to the City's external auditors, he became upset and told Plaintiff Ohno that he would discuss this and other issues with MHM Partner, Ken Al-Iman directly;

(j)     The City misused redevelopment funds to demolish two vacant parcels occupied by the Senior Center within the City. Although these parcels had been vacant and undeveloped for over two years, the City classified them as "buildings" and depreciated them on the audited financial statements issued in prior years. Mr. Charles Meremkwu, who was employed as a staff accountant for the City, reported these discrepancies to Defendant Koike in 2012 and 2013. When Plaintiff inquired about this discrepancy in prior years and during the then-current audit period, Defendant Koike wrongly opined that the audited financial statements did not need to be supported by the books or records and instructed Plaintiff's staff to ignore it;

(k)     In 2015, Plaintiff discovered that the City's long range property management plan filed with the California Department of Finance was riddled with major discrepancies. The long range property management plan had been prepared by Mr. Jones' personal contractor and it was not

27
Complaint

vetted by redevelopment personnel as it should have been.  Plaintiff worked with Ms. Margarita Cruz to correct the properties' Accessor Parcel Number (APN) and the values.  When Mr. Jones learned of this, he said the accuracy of the long range property management plan was unimportant because the properties would eventually revert back to the City and nobody would be the wiser;

(l)    On January 13, 2015,  February 11, 2015 and February 12, 2015, Defendant Esparza told Plaintiff Ohno that Defendant Mayor Butts considered Plaintiff a "trouble maker" who needed to "know her place" otherwise Plaintiff would not have a job with the City;

(m)    The City handed out redevelopment funds to developers as "loans" with no apparent intention of requiring the developers to repay the so-called loans.  Since 2012, Defendants Koike and Esparza failed to monitor compliance or performance of these loans to favored developers.  This was apparent because the City, with the help of Defendants Esparza and Koike, fully reserved all of these loans as non-collectible.  Plaintiff Ohno asked Defendant Koike for backup documents to justify why these "loans" were fully reserved as non-collectible because the loans were made with public money.  In response, Defendant Esparza told Plaintiff Ohno to stop asking for backup documentation and to leave it to Defendant Koike to handle; and

(n)    The City failed to monitor redevelopment loans for repayment and compliance to senior/low income ratios for affordable housing purposes as was required by such loans.  This lack of monitoring meant there was no assurance that the properties were properly operated for affordable housing and the redevelopment agency received payment in accordance with the terms of these loans.

61.     Every time Plaintiff complained to Defendants Esparza and Koike about the above improprieties beginning in the fall of 2014 and continuing until her termination in June 2015, they told her to look the other way and keep her mouth shut. When Plaintiff continued to complain about the situations and urged remedial action and transparency, Plaintiff was met with scorn, bullying, isolation, harassment, and non-cooperation so that Plaintiff could not fulfill her job responsibilities. This treatment persisted throughout the entirety of the Plaintiff's 9-months of employment with the City and was perpetuated and encouraged by Defendants Esparza and Koike with the blessing of Defendant Mayor Butts who, at the time, was courting an NFL team to relocate to Inglewood.

62.     Plaintiff Ohno's scope of responsibility at the City was to implement certain financial and accounting tasks and to make sure audits were completed. She was not hired to troubleshoot or report problems with the financial or accounting policies, practices or procedures. However, when she observed the ongoing irregularities and intentional cover ups by the Defendants, she had no choice but to venture outside of her official job duties and "blow the whistle" not only to her immediate supervisor, Defendant Esparza, but to many other managers in other departments, hoping someone would step in and take remedial action. Plaintiff Ohno was sorely disappointed when everyone she went to refused to assist her in rectifying the Finance Department's financial, accounting and reporting practices.

**Accounting Irregularities Abound**

63.     Defendant City knowingly allowed Defendant Koike to hold herself out as a certified public accountant despite the fact that her license was inactive. Defendant Koike used a City business card identifying her as a "CPA" without any "inactive" restriction. During the entire time that Plaintiff was employed by the City, Defendant Koike represented herself as a CPA to banks, regulatory agencies and City officials.

29
Complaint

64.    Defendant Koike hired Matthew Lenton, a former MHM partner, to prepare audit schedules for audits performed by MHM for the periods during and after which he was associated with MHM.  Essentially, Mr. Lenton was hired to audit himself which violated proper audit protocol due to his inherent conflict of interest.

65.    In concert with Defendant Koike, MHM knowingly received faulty information from Defendant Koike, failed to conduct standard due diligence and failed to use generally accepting auditing procedures.  Defendant Koike knowingly provided false and misleading information to MHM which resulted in materially misstated financial statements for the City.  To make matters worse, MHM failed to take steps to confirm whether Defendant Koike's information was true or not.  On March 23, 2015, Plaintiff informed Defendant Esparza of the intentional misrepresentation by Defendant Koike and the falsified schedules prepared by Mr. Lenton at the request of Defendant Koike but he, Defendant Esparza, refused and failed to take remedial action.

66.    One method used by Defendant Koike to falsify financial information to the external auditors involved Defendant Koike instructing billing clerks in the City's Finance Department to bill costs that were unsupported by agreements and timesheets.  Contrary to accepted accounting practices, MHM failed to request developer notes, sales agreements, joint agreements with other cities and other basic back up documentation in the course of auditing the City and preparing its financial statements.

67.    As early as October 2014 and until her termination in June 2015, Plaintiff discovered the above accounting discrepancies and then reversed millions of dollars of entries that had been recorded in the City's books as fictitious accounts receivable and which were unsupported by subsequent cash receipts or agreements.  Plaintiff was subsequently brought into meetings by Defendants Koike and Esparza where Plaintiff requested support for these discrepancies and was told repeatedly that Plaintiff didn't

1  understand the City's "plantation mentality" and how the City operated under the

2  Mayor.

3      68.    Defendant Koike used City funds to pay MHM for audit services without

4  an executed audit services agreement.  Further, Defendant Koike authorized payment

5  to MHM for audit services for City non-profit organizations (Inglewood Community

6  Services Corporation and Inglewood CMAC) which were not performed.  MHM was

7  not aware that CMAC had lost its non-profit status in 2012 and was no longer

8  authorized to conduct business in California.  MHM was responsible for conducting

9  due diligence to ensure the financial viability of organizations doing business with the

10  City, however, it refused to do so and declared that it was the City's problem, not

11  MHM's.

12      69.    During the time that Plaintiff Ohno was employed by the City, Defendant

13  Koike's CPA licensed had lapsed and she (Koike) was an "inactive" CPA.  Defendant

14  Koike was not current with accounting pronouncements and often misinterpreted them

15  in order to misstate the financial position of the City, its state, federal, and locally

16  funded programs and the General Fund balance.  The City relied on Defendant

17  Koike's faulty advice and misguided recommendations to the detriment of the City

18  and its citizens/residents.  For example, Defendant Koike advised that the City's Chief

19  Financial Officer had discretion to not set aside a portion of the fund balance for

20  contractually obligated liabilities resulting from union contracts.  This resulted in the

21  understatement of approximately $300,000 of expenses that were paid by the City but

22  not recorded in fiscal year 2014.  An additional $500,000 of expenses was incurred by

23  the City but not recorded in fiscal year 2015; Defendant Koike also (a) advised the

24  City that proprietary and enterprise funds did not have to be accounted for on the full

25  accrual method of accounting in regard to the uncollectible water bills sitting on the

26  City's books since 2012; (b) the City had no obligation to accrue for any employee

27  benefit such as vacation or paid time off, which the employees earned; and (c) advised

28

31

Complaint

that the parking fund, a subcontracted parking service for the City and other cities, was not an enterprise fund and therefore accounting rules allowed discretionary assignment and accounting for these types of funds.  Each of these incidents represented faulty accounting advice by Defendant Koike which was known and tolerated by the City and Defendant Esparza.  When Plaintiff raised these inaccuracies with Defendant Koike, Plaintiff was soundly reprimanded beginning in January 2015 and continually thereafter until Plaintiff Ohno was wrongfully terminated in early June 2015.

70.    Defendant Koike never or rarely reviewed in detail, account reconciliations such as bank reconciliations, grant reconciliations, or HUD regulatory reporting or compliance despite the fact that all of these duties were within the scope of her regular duties and responsibilities.

71.    In early 2015, in order to provide reconciliations necessary for the City's audits, Plaintiff Ohno requested supporting back-up documentation from Defendant Koike who refused and then reprimanded Plaintiff for meddling.  Defendant Esparza, who was knowledgeable about Plaintiff Ohno's plight, refused to instruct Defendant Koike to cooperate with Plaintiff.  Soon thereafter, Plaintiff was wrongfully terminated by the City without notice or justification.

### Plaintiff Suffers Personal Injuries as a result of the Harassment

72.    As a direct and proximate result of the harassment, ridicule and scorn from the Defendants, Plaintiff Ohno suffered serious medical injuries which manifested in December 2015 in the form of numbness in her arm for which she underwent a battery of tests and medical consultations at great expense to her. Neurologists diagnosed her malady as a series of mini strokes known as "transient ischemic attacks" (TIA) which could be caused by stress.

73.    The injuries continued to plague Plaintiff into 2015 and only subsided after she was no longer employed by the City in June 2015.

**Plaintiff's Internal Complaint and Retaliatory Termination**

74.     While employed by the City, Plaintiff Ohno filed a formal internal complaint on April 8, 2015, complaining about the events and circumstances alleged herein, including financial and accounting irregularities, fraudulent financial reporting to regulators, workplace harassment, workplace bullying, disparate treatment and retaliation.  Plaintiff filed her complaint with Michael Falkow, the Assistant City Manager, at his request.  A true and correct copy of Plaintiff's internal complaint filed on April 8, 2015 is attached hereto as **Exhibit "A"** (the "Internal Complaint") and incorporated herein by reference.

75.     Because Plaintiff Ohno refused to "look the other way" and refused to allow financial irregularities and fraud to continue and go unchecked at the City, she continually brought the problems to the attention of her immediate supervisor, Defendant Esparza, and her Finance Department colleague, Defendant Koike, both of whom dictated the practices of the Finance Department at the City.  Defendants Esparza and Koike actively participated in the commission and concealment of the irregularities and fraud and constantly tried to get Plaintiff to do the same but she refused because of her ethical values, personal integrity and duties as a licensed Certified Public Accountant.

76.     When Plaintiff Ohno's attempted to rectify and disclose the City's financial, accounting and reporting irregularities, she was stopped and reprimanded at every turn by Defendants Esparza and Koike who repeatedly told Plaintiff to play along and be a team player.  At all times, Defendants Esparza and Koike emphasized that they knew best because they had been with the City for many years and Plaintiff, the newcomer, didn't understand how the game was played.  Plaintiff's insistence for proper procedures and transparency collided with the manner in which the City ran its business and the governing style of Defendant Mayor Butts.

77.     Defendant Esparza repeatedly interceded to stop Plaintiff from upsetting

1  the apple cart and tried to convince her that the irregularities she discovered were
2  unimportant or would be covered up when the money from the football stadium and
3  mixed-use development began to flow into the City.

4      78.    On January 13, 2015 and on February 13, 2015, Defendant Esparza told
5  Plaintiff Ohno that Defendant Mayor Butts considered her to be a "trouble maker" and
6  that if she didn't fall into line, she would lose her job at the City.

7      79.    When Plaintiff's complaints fell on deaf ears with Defendants Esparza
8  and Koike, she reached out to other City employees outside of the Finance
9  Department as alleged in Paragraphs 55-57, *supra*, in a desperate attempt to get
10 someone to take action to correct the City's improper and misleading accounting and
11 financial practices, however, none of them took steps to remedy the problems
12 observed and reported by Plaintiff.  Plaintiff Ohno even spoke with the City Attorney,
13 Ken Campos, about her frustrations and observations but he took no action other than
14 to engage outside legal counsel for the City to investigate her claims.

15     80.    The entirety of Plaintiff's approximately 9-month employment tenure at
16 the City was filled with her discovering improprieties, reporting her concerns and
17 trying to convince her superiors and colleagues, other City personnel and the outside
18 auditors to take action, all to no avail.  Plaintiff communicated her concerns to
19 Defendant Esparza, her immediate supervisor, on nearly a daily basis.  Each time,
20 Defendant Esparza told Plaintiff that he would get the information and documentation
21 that she needed to do her job but only did so in a handful of instances.  When advised
22 of the harassment being directed towards Plaintiff Ohno, Defendant Esparza took no
23 remedial steps.  Defendant Esparza told Plaintiff Ohno to "fly under the radar and not
24 speak with anyone."  In fact, when it came to responding to questions from the federal
25 DOJ, Defendant Esparza stopped Plaintiff and others from responding because they
26 were going to respond candidly about the City's non-compliance.  Instead, Defendant
27 Esparza took over the job of word smithing the City's responses to the DOJ because
28

he wanted to be less than transparent with the federal authorities. Defendant Esparza regularly told Plaintiff Ohno that he was the boss and would make decisions that he expected her to follow.

81.    It was apparent that Plaintiff Ohno's complaints reached Defendant Mayor Butts because Defendant Esparza told Plaintiff on more than one occasion that the Mayor considered her to be a "trouble maker." Defendant Esparza told Plaintiff Ohno "don't make me regret bringing you here if you want to keep your job."

82.    As early as October 2014, the Defendants began retaliating against Plaintiff Ohno by creating a harassing and hostile work environment within the Finance Department. Plaintiff was unable to get subordinates and colleagues to provide her with documentation and information that she needed to reconcile accounts and to document transactions. When Plaintiff Ohno communicated her frustrations and concerns to the City's outside auditors and City employees, she was soundly reprimanded by Defendant Esparza. Defendant Esparza told Plaintiff Ohno not to air the Finance Department's "dirty laundry." Plaintiff Ohno is informed and believes and thereupon alleges that the message Defendant Esparza was sending was that if the other Finance Department employees cooperated with Plaintiff Ohno, they, too, would be fired and, therefore, by asking for their cooperation, Plaintiff Ohno was placing her colleagues' employment at risk along with hers.

83.    Plaintiff Ohno is informed and believes and thereupon alleges that her colleagues in the Finance Department who refused to cooperate with her were acting on the instructions of Defendants Koike and Esparza as part of an organized scheme to isolate and neutralize Plaintiff Ohno. Likewise, Plaintiff Ohno is informed and believes and thereupon alleges that Defendants Esparza and Koike were operating on the express or implicit orders of Defendant Mayor Butts who called the shots at the City. By thwarting her efforts to expose the irregularities and fraud practiced by the City, Defendants were engaged in a massive cover-up campaign to prevent these

1 | issues from seeing the light of day because, in large measure, of the potential negative
2 | impact it would have on the City's bid for an NFL team and the revitalization it would
3 | bring to the City.

4 |     84.    After filing her Internal Complaint in early April 2015, Artie Fields, City
5 | Manager told Plaintiff that she would no longer report to Defendant Esparza and,
6 | instead, she was told to report directly to him, Mr. Fields. This realignment angered
7 | Defendant Esparza who retaliated against Plaintiff Ohno – he ordered her to not attend
8 | any meetings without him present.

9 |     85.    At all times, Defendant Esparza was at odds with City Manager Artie
10 | Fields and Assistant City Manager Michael Falkow because he wanted to be promoted
11 | to the City Manager position over them. Plaintiff is informed and believes and
12 | thereupon alleges that Defendant Esparza's career agenda motivated him to do
13 | Defendant Mayor Butts' bidding without question so that someday he, Defendant
14 | Esparza, would be supported by the Mayor to become the City Manager of Inglewood.

15 |     86.    At all times, Plaintiff performed her duties with excellence, diligence and
16 | distinction. At no time was Plaintiff criticized or "written up" for poor work
17 | performance. The only criticism of Plaintiff was that she was rocking the boat and not
18 | being a team player with respect to her insistence that financial and accounting
19 | improprieties be remedied and disclosed.

20 |     87.    On May 27, 2015, Plaintiff Ohno was contacted by Lloyd Pinchen, Esq.
21 | of the law firm Olivarez Madruga, P.C., the City's outside legal counsel. Mr. Pinchen
22 | advised her that the City was conducting an investigation due to the serious and
23 | pervasive nature of the allegations in her April 8, 2015 Internal Complaint.

24 |     88.    On May 27, 2015, Plaintiff Ohno met with Mr. Pinchen for nearly four
25 | (4) hours and openly disclosed the facts and circumstances of her complaint and
26 | identified witnesses who could corroborate her story. Mr. Pinchen asked Plaintiff
27 | Ohno to provide him with additional names of City employees who could corroborate
28 |

her story and she agreed to do so following their meeting.  Mr. Pinchen said that the scope of his investigation did not go beyond early April 2015, the date of Plaintiff Ohno's Internal Complaint.  When Plaintiff Ohno asked why, Mr. Pinchen said she would have to take it up with the City Attorney, Ken Campos, because it involved human resources issues.

89.    A few days after her interview with Mr. Pinchen, Plaintiff Ohno informed City Attorney Ken Campos about Mr. Pinchen's response to follow up with Mr. Campos, as the harassment, intimidation and retaliation had exacerbated after Plaintiff had filed her Internal Complaint. In response, City Attorney Campos said that he could not discuss it with her because he would eventually be called upon to defend the City against Plaintiff's Internal Complaint.

90.    Eight (8) days after Plaintiff's meeting with attorney Pinchen, she was terminated by the City without being allowed to provide Mr. Pinchen with the additional information that he had requested.  Late in the afternoon on June 4, 2015, Plaintiff Ohno was called into a meeting with Artie Fields, the City Manager, and Jose Cortes, the Human Resources Director.  Messrs. Fields and Cortes read from a prepared, written script and informed her that her services were no longer needed by the City and that she should leave immediately.  When Plaintiff asked why she was being let go, Messrs. Fields and Cortes told her that the City Attorney, Ken Campos, instructed them to limit their comments to the prepared script and say only that she had failed her probationary period, without any details.  Plaintiff received no severance or other compensation from the City upon her exit that same day.

91.    Plaintiff Ohno is informed and believes and thereupon alleges that her termination was in retaliation for having blown the whistle on the City and its personnel within and outside of the Finance Department and within and outside of the City.

92.    Following the sudden termination of Plaintiff's employment with the

Complaint

City, she had difficulty finding new employment for many months despite her diligent efforts. Plaintiff took on temporary consulting projects from time to time but was not able to secure regular, full-time employment until March 15, 2016, over eight and half months after being abruptly and wrongfully terminated by the City.

93.    On September 8, 2015, Plaintiff Ohno filed an administrative complaint with the City Clerk alleging that she was wrongfully terminated for having exposed financial and regulatory irregularities in the City's Finance Department and elsewhere in the City (the "Claim for Damages"). A true and correct copy of said Claim for Damages is attached hereto as **Exhibit "B"** and incorporated herein by reference.

94.    In November 2015, Plaintiff Ohno filed formal complaints with the Department of Housing and Urban Development ("HUD"), the federal Department of Justice ("DOJ"), the State Board of Accountancy and the California State Auditor. To date, only HUD has taken any action to investigate Plaintiff's allegations which mirror the allegations in this Complaint.

95.    On December 1, 2015, the City Council denied Plaintiff Ohno's Administrative Complaint and informed her that she had six (6) months to file any lawsuit against the City. A true and correct copy of said Notice of Denial is attached hereto as **Exhibit "C"** and incorporated herein by reference. This judicial action is filed in a timely manner.

## FIRST CAUSE OF ACTION

**[Violation of First and Fourteenth Amendments of the United States Constitution (42 U.S.C. §§ 1983 and 1988) Against the Individually Named Defendants in their Official and Individual Capacities, and DOES 1 through 10, inclusive]**

96.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 95, inclusive, of the Complaint and incorporates the same herein by reference as though fully set forth.

97.    This cause of action arises under Title 42 United States Code, §§ 1983

and 1988 wherein Plaintiff seeks to redress deprivation under color of state law of a right, privilege or immunity secured under the First Amendment and applied to the States under the Fourteenth Amendment.

98.   As a result of the above described intentional acts and omissions of the individual Defendants, and each of them, Plaintiff's constitutional right that is the First Amendment was violated when, as a result of Plaintiff engaging in protected speech, the individual Defendants created a hostile work environment and engaged in a pattern of retaliation against Plaintiff.

99.   Plaintiff Ohno engaged in speech that was a matter of public concern by speaking out about the improper and illegal accounting, financial and reporting practices of the City and its misuse of public money as alleged hereinabove.

100.   Plaintiff Ohno engaged in the First Amendment speech as a private citizen and not as part of her official duties in that Plaintiff reported about the improper and illegal accounting, financial and reporting practices of the City whereas her official duties were to execute discrete accounting and audit functions.  Plaintiff's speech was made outside the course and scope of her official duties and to personnel outside of her normal chain of command at the City because her complaints to her immediate supervisor, Defendant Esparza, and her Finance Department colleague, Defendant Koike, were ignored.  The individual Defendants repeatedly thwarted her efforts to blow the whistle on the City and the Finance Department.  Defendant Esparza and Defendant Koike repeatedly told Plaintiff Ohno to turn a blind eye and keep her mouth shut about the financial and accounting irregularities that she had discovered in the Finance Department so that Defendant Mayor Butts' vision of government could be fulfilled.

101.   As described herein, Plaintiff's protected speech was a substantial or motivating factor in the adverse employment actions taken against Plaintiff because her termination came on the heels of her April 2015 internal complaint.

102.   Each of the individually named Defendants were aware that Plaintiff engaged in protected speech.

103.   There was no adequate justification for Plaintiff to suffer from the adverse actions described herein and it was clear that Plaintiff suffered from unjustified disparate treatment which ultimately led to her termination as a result of her exercise of protected speech.

104.   Absent the protected speech of the Plaintiff, she would not have suffered from the adverse actions taken against her, and thus the individual Defendants did not have a legitimate reason to take the adverse actions described herein.

105.   The above referenced acts and omissions of the individually named Defendants and each of them, were conducted in their official governmental capacities as employees of the City.

106.   Plaintiff is informed and believes and thereupon alleges that at all times mentioned herein, the individually named Defendants and DOES 1 through 10, inclusive, and each of them, were duly appointed, qualified and acting agents/employees of the City and that all times mentioned herein, were acting within the course and scope of such capacities under the color of state law.

107.   Defendants and DOES 1 through 10, inclusive, and each of them, failed and refused to intervene or prevent or try to prevent the wrongful conduct of the other.

108.   As a direct and proximate result of defendants' conduct, Plaintiff has suffered from physical injury and illness, mental anguish, emotional stress and anxiety damages, in an amount to be proven at trial and in an amount sufficient to invoke the jurisdiction of this Court.  Plaintiff incurred medical expenses for treatment of her injuries and claims special damages in a sum to be determined by this Court.

109.   As a further proximate result of the aforementioned acts of Defendants, and each of them, Plaintiff suffered from loss of income, loss of future income and earning capacity, loss of benefits and loss of pension benefits in a sum to be

Complaint

1 | determined by the Court. Plaintiff also seeks prejudgment interest for the loss of past

2 | income.

3 |     110. The aforementioned acts and omissions of each defendant was done by

4 | each individual Defendant knowingly, intentionally, willfully, maliciously or with

5 | such callous disregard with purpose of harassment, oppression and infliction of injury

6 | upon Plaintiff's civil rights and by reason thereof Plaintiff claims exemplary and

7 | punitive damages from Defendants and DOES 1 through 10, inclusive, except

8 | defendant City of Inglewood, in a sum to be determined the Court, to deter, prevent

9 | and educate said defendants from ever inflicting such injuries again upon any other

10 | individual.

11 |     111. By reason of the aforementioned acts and omissions of Defendants, and

12 | each of them, Plaintiff retained attorneys to represent her and did incur investigation

13 | costs, expenses, attorneys' fees and legal costs. Plaintiff requests payments by

14 | defendants, and each of them, for compensation of fees and costs pursuant to Title 42

15 | U.S.C. § 1988.

### SECOND CAUSE OF ACTION

**[*Monell* Claim for Violation of the First and Fourteenth Amendments to the United States Constitution against the City of Inglewood]**

19 |     112. Plaintiffs repeat each and every allegation contained in Paragraphs 1

20 | through 111, inclusive, of the Complaint and incorporates the same herein by this

21 | reference as though fully set forth.

22 |     113. Defendant Mayor Butts who, at all times herein mentioned, served as the

23 | Mayor of the City of Inglewood was the chief policy and decision maker of the City of

24 | Inglewood.

25 |     114. For purpose of liability under *Monell v. New York City Department of*

26 | *Social Services* 436 U.S. 648 (1978) the "decision to adopt [a] particular course of

27 | action by th[e] government's authorized decision makers surely represents an act of

28 |

official governmental 'policy.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Under appropriate circumstances, even a single decision by authorized decision makers may represent an official "policy" for purpose of *Monell*. *Pembaur* at 481. A policy for purposes of *Monell* may either be "explicitly adopted" or "tacitly authorized," *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir. 1986).

115. Defendant City of Inglewood maintained a practice and policy as set forth by Defendant Mayor Butts, its chief policy maker, and as implemented by other City employees such as Defendant Esparza and Defendant Koike, City Attorney Ken Campos, and Royce Jones, the Mayor's advisor, which permitted the occurrence of the type of wrongs described herein. Based on the principles set forth in *Monell*, *supra*, and *Heller v. Bushey*, 759 F.2d 1371 (9th Cir. 1985), Defendant City of Inglewood is liable for all injuries sustained by Plaintiff.

116. In particular, the City maintained a policy, custom or practice of discouraging, stifling and retaliating against its employees, like Plaintiff Ohno, who exercised their constitutional rights to protected speech for reporting financial and accounting wrongdoing within the Finance Department and the City at large as evidenced by the other Finance Department employees who refused to assist Plaintiff Ohno for fear of losing their jobs, as Plaintiff ultimately did, for exposing the improprieties and fraud alleged herein.

117. The City's top official, Defendant Mayor Butts, considered Plaintiff Ohno to be a "trouble maker" as conveyed to her by her immediate supervisor, Defendant Esparza on more than one occasion as alleged herein. The Mayor, through his subordinate, Defendant Esparza, warned Plaintiff Ohno that if she persisted in reporting the financial and accounting wrongdoing outside of the Finance Department, her job at the City would be in jeopardy as alleged herein.

118. The pervasive nature and scope of these warnings to Plaintiff Ohno

throughout her employment with the City demonstrates that this style of management within the City reflected a widespread and condoned policy, custom or practice of intimidating employees from exercising their constitutional rights of free speech and threatening to terminate or actually terminating those who refused, like Plaintiff Ohno, to look the other way and allow improper and fraudulent financial and accounting practices of the City to persist unchecked. This policy, practice or custom was levied against others such as City employee, Melissa Hebert, who was warned by top City officials to not publish anything negative about the City in her blog, and if she did, she would be fired, as alleged hereinabove.

119. The Mayor's warnings, conveyed to Plaintiff by Defendant Esparza, evidence the existence and imposition of the City's policy of tamping down negative information and Defendant Esparza was willing to participate in this policy because of his aspirations to someday become the City Manager. Defendant Koike was willing to participate in the implementation of this policy because if and when Defendant Esparza was elevated to the position of City Manager, he planned to elevate Defendant Koike to the Chief Financial Officer position at the City as alleged above.

120. Plaintiff Ohno paid the ultimate price for exercising her constitutional rights as a private citizen when, over a period of several months, she exposed the City's pervasive misuse of public money – the City could not silence Plaintiff so it fired her in retaliation for the exercise of her constitutional rights and duties as a private citizen to report financial and accounting abuses by the City. The City's termination of Plaintiff Ohno's employment within weeks after she filed a formal complaint is evidence that her termination was in retaliation for her exercise of protected speech.

121. At all times herein, Plaintiff Ohno possessed certain civil rights, including the right to free speech. As a result of the actions of Defendant City of Inglewood and its policymaker, Defendant Mayor Butts, Plaintiff Ohno's First

43
Complaint

1  Amendment rights to free speech were violated when she was retaliated against for
2  disclosing and reporting the illegal actions of City personnel, as set forth herein.

3      122.   The conduct of Defendant City of Inglewood as alleged herein, and the
4  violation of the civil rights of Plaintiff Ohno was a product of its policy to retaliate
5  against Plaintiff Ohno and others for engaging in protected speech. By approving and
6  participating in the wrongful and retaliatory adverse employment actions, including
7  the termination of the Plaintiff Ohno, the City of Inglewood and its policymakers
8  undertook a course of action to retaliate against Plaintiff Ohno in violation of her First
9  Amendment rights and thus Defendant City of Inglewood is liable under *Monell*,
10  *supra*.

11      123.   As a result of the above described intentional acts and omissions of
12  Defendant City of Inglewood in failing to preserve and protect Plaintiff's
13  constitutional rights, Plaintiff's constitutional rights, contained in the First and
14  Fourteenth Amendments, were violated when Plaintiff Ohno suffered from the
15  adverse employment actions as described herein, including, but not limited to, the
16  termination of her employment on June 4, 2015.

17      124.   As a direct and proximate result of the aforementioned acts of
18  defendants, and each of them, Plaintiff suffered from a physical injury and illness,
19  mental anguish, emotional distress and anxiety damages, in a sum to be determined by
20  this Court.

21      125.   As a further proximate result of the aforementioned acts of Defendants,
22  and each of them, Plaintiff suffered from loss of employment, loss of income, loss of
23  future income, loss of benefits and loss of pension benefits in a sum to be determined
24  by this Court.

25      126.   By reason of the aforementioned acts and omissions of Defendants, and
26  each of them, Plaintiff retained attorneys to represent her and did incur investigation
27  costs, expenses, attorneys' fees, and legal costs. Plaintiff requests payments by

28

1  defendants, and each of them, for compensation of fees and costs pursuant to Title 42

2  U.S.C. § 1988.

3  ### THIRD CAUSE OF ACTION

4  ### [Whistleblower Retaliation in Violation of Labor Code Section 1102.5

5  ### against All Defendants]

6      127.   Plaintiff repeats each and every allegation contained in Paragraphs 1

7  through 126, inclusive, of the Complaint and incorporates the same herein by this

8  reference as though fully set forth.

9      128.   Plaintiff Ohno engaged in protected activity pursuant to California Labor

10  Code section 1102.5, by reporting to the City Attorney of the City of Inglewood and

11  others in positions of authority that Defendants were engaging in criminal activity

12  defrauding the Federal and State governments in the City's intentional mishandling of

13  federal grant and state funds.

14      129.   As a result of Plaintiff Ohno engaging in protected activity pursuant to

15  California Labor Code section 1102.5, Defendants and each of them, engaged in

16  retaliation which culminated in the termination of Plaintiff's employment as alleged

17  herein.

18      130.   Each of the Defendants was aware that Plaintiff Ohno was engaging in

19  protected speech because they were aware that her complaints were outside of her

20  official job duties and that she made her complaints to individuals outside of her

21  department, the Finance Department, i.e., beyond the normal chain of command.

22      131.   There was no adequate justification for Plaintiff Ohno to suffer from the

23  adverse actions described herein and it was clear that Plaintiff Ohno suffered from

24  unjustified disparate and retaliatory treatment.

25      132.   Absent the protected speech of Plaintiff Ohno, she would not have

26  suffered from the adverse action taken against her, and thus Defendants did not have a

27  legitimate reason to take the adverse actions described herein.

28

133.   The above referenced acts and omissions of the individuals named as Defendants, and each of them, were conducted in their official governmental capacities.

134.   Plaintiff Ohno is informed and believes and thereby alleges that at all times mentioned herein, the named individual Defendants and DOES 1 through 10, inclusive, and each of them, were duly appointed, qualified and acting agents/employees, of the City, and that all times mentioned herein, were acting within the course and scope of such capacities under color of law.

135.   Defendants and DOES 1 through 10, inclusive, and each of them, failed and refused to intervene or prevent or try to prevent the wrongful conduct of the other.

136.   As a direct and proximate result of the aforementioned acts of Defendants, and each of them, Plaintiff Ohno suffered from physical injury and illness, mental anguish, emotional stress and anxiety damages, in a sum to be determined by this Court.

137.   As a further proximate result of the aforementioned acts of Defendants, and each of them, Plaintiff Ohno suffered from loss of income, loss of future income, loss of benefits and loss of pension benefits in a sum to be determined by this Court. Plaintiff will also seek prejudgment interest for loss of past income,

138.   The aforementioned acts and omissions of each Defendant was done by each defendant knowingly, intentionally, willfully, maliciously or with such callous disregard with purpose of harassment, oppression and infliction of injury upon the Plaintiff.  This was done with reckless, wanton and callousness of Plaintiff's civil rights and by reason thereof, Plaintiff claims exemplary and punitive damages from defendants and DOES 1 through 10, except Defendant City of Inglewood, in the sum to be determined by this Court, to deter, prevent and educate said defendants from ever inflicting such injuries again upon any other individual.

139.   On September 8, 2015, Plaintiff filed a claim for damages with the City

of Inglewood. In early December 2015, Plaintiff received the City's December 1, 2015 notice that her claims for damages were denied. Plaintiff brings this action within the statutory time period for commencement of a judicial action.

140. As a result of the aforesaid unlawful acts of defendants, and each of them, Plaintiff suffered from physical illness and injuries and was personally humiliated and has become mentally upset, distressed and aggravated from defendants' wrongful acts and/or omissions as described herein.

141. Plaintiff has suffered from sleeplessness, depression, anxiety, loss of identity, isolation, lack of confidence, and impaired health. The treatment of Plaintiff in the City workplace was an attack on her integrity and honesty which has caused her to lose income and income opportunities, in an amount to be proven at trial.

142. Plaintiff claims such amounts as damages together with prejudgment interest pursuant to *California Civil Code*, section 3287 and/or other provisions of law providing for prejudgment interest.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.  For general damages in an amount according to proof at trial; and

2.  For special damages in an amount according to proof at trial; and

3.  For punitive damages in an amount appropriate to punish the Individual Defendants, for their wrongful conduct. Punitive damages are not sought against the City of Inglewood.

4.  For attorneys' fees pursuant to Title 42 of the United States Code, section 1988(b);

5.  For costs of suit incurred herein;

6.  For interest as allowed by law; and

7.    For such other and further relief as the Court may deem just and proper.

DATED: May 18, 2016                    ISHIMATSU LAW GROUP, P.C.


By: _____
        Bruce L. Ishimatsu
        Attorneys for Plaintiff Barbara H. Ohno


## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands trial of all issues and claims by jury pursuant to Rule 38(a) of the Federal Rules of Civil Procedure.

May 18, 2016.                    ISHIMATSU LAW GROUP, P.C.


By: _____
        Bruce L. Ishimatsu
        Attorneys for Plaintiff Barbara H. Ohno

48
Complaint